880 F.2d 807
 50 Fair Empl.Prac.Cas. 1015,
51 Empl. Prac. Dec. P 39,243, 14 Fed.R.Serv.3d 906
 Gregory R. WILSON, Plaintiff-Appellant,
v.
SOUTHWEST AIRLINES, INC., Defendant-Appellee.
Gregory R. WILSON, Plaintiff-Appellant, Cross-Appellee,
v.
SOUTHWEST AIRLINES, INC., Defendant-Appellee, Cross-Appellant.
Gregory R. WILSON, Plaintiff-Appellee, Cross-Appellant,
and
Mark N. Peeples, Intervenor-Appellee, Cross-Appellant,
and
Transport Workers Union of America, AFL-CIO, Intervenor-Appellee
v.
SOUTHWEST AIRLINES, INC., Defendant-Appellant, Cross-Appellee.
Gregory R. WILSON, Plaintiff-Appellant,
v.
TRANSPORT WORKERS UNION OF AMERICA, AFL-CIO, Intervenor-Appellee,
v.
SOUTHWEST AIRLINES, INC., Defendant-Appellee.
 Nos. 85-1138, 86-1552, 87-1083 and 87-1383.
 United States Court of Appeals,
Fifth Circuit.
 Aug. 2, 1989.
 
 Kenneth H. Molberg, Donald J. Maison, Jr., Wilson, Williams & Molberg, Dallas, Tex., for Gregory R. Wilson.
 Shelton E. Padgett, Akin, Gump, Strauss, Hauer & Feld, San Antonio, Tex., for Southwest Airlines, Inc.
 G. William Baab, Mullinax, Wells, Baab & Cloutman, Dallas, Tex., for Transport Workers Union of America.
 George B. Flint, Dallas, Tex., for other interested party--Women's Center of Dallas.
 Appeals from the United States District Court for the Northern District of Texas.
 Before GARWOOD and JOLLY, Circuit Judges.*
 E. GRADY JOLLY, Circuit Judge:
 
 
 1
 Gregory R. Wilson filed a class action suit against Southwest Airlines, alleging that Southwest's policy of hiring only female flight attendants violated Title VII of the Civil Rights Act of 1964. After the liability trial in which the district court found for the class, the court approved the parties' consent decree, under which, inter alia, Southwest gave male hires retroactive seniority and created a $1 million back-pay fund to compensate victims of the hiring policy. The court also ordered Southwest to pay $275,000 in attorneys' fees to class counsel for hours already spent on the case and for an estimated 600 future hours to be spent on claims administration in execution of the decree. When it became clear that complete discharge of the class members' claims had not exhausted the back-pay fund, class counsel requested from the fund additional attorneys' fees for uncompensated hours. Southwest opposed class counsel's request and sought return of the fund balance. The district court denied both requests. Instead, under the cy-pres doctrine, the court awarded the fund residue to a charity, the Communities Foundation of Texas ("CFT"). Class counsel and Southwest appealed, and at oral argument announced a settlement dividing the fund balance between themselves. We have permitted CFT, not a party to the appeal, to submit briefs defending its interests. We now reverse and vacate the district court's orders and approve the settlement.
 
 
 2
 * A.
 
 
 3
 On June 12, 1981, the district court found that Southwest Airline's policy of hiring only female flight attendants and ticket agents violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000e, et seq. The court also held that the airline's height limitation of five feet nine inches discriminated against male applicants for flight attendant positions. See Wilson v. Southwest Airlines Co., 517 F.Supp. 292, 26 FEP Cases 989 (N.D.Tex.1981).
 
 
 4
 After the liability trial, the class and Southwest reached a settlement. On July 1, 1982, the district court held a "fairness hearing" to examine the settlement, and approved it the next day. In the consent decree, Southwest established a $1 million fund for back pay to male applicants denied employment. The decree included the following provision: "The fund shall become nonrefundable to Defendant upon this decree becoming a final non-appealable judgment. Any residual fund may be utilized, after all payment of backpay, as the Court directs."
 
 
 5
 Additionally, pursuant to agreement between the parties, the court awarded class counsel fees of $275,000. This amount included payment for the 600 hours class counsel estimated as necessary to complete post-decree administration of the back-pay fund. The court noted that the 600-hour estimate might "prove to be on the low side before it's over." When the agreed fee is divided by billable hours, including the 600 hours, the hourly rate for class counsel was $149. The court approved the consent decree and the award of attorneys' fees. The consent decree also provided that the new male hires would be granted retroactive seniority.
 
 
 6
 On September 24, 1982, Transport Workers Union of America ("TWU"), representing the incumbent female Southwest flight attendants, filed a petition to intervene to contest the retroactive seniority provision in the consent decree. TWU contended that only actual victims of discrimination should receive retroactive seniority. On August 10, 1983, the district court granted TWU's petition to intervene, and subsequently ordered additional discovery. On January 4, 1985, another district judge, who had assumed responsibility for the case, denied TWU's request to modify the consent decree. TWU appealed, but dropped its appeal after the Supreme Court's decision in Local No. 93, International Ass'n of Firefighters v. City of Cleveland, 478 U.S. 501, 106 S.Ct. 3063, 92 L.Ed.2d 405 (1986).
 
 B.
 
 7
 By March 25, 1983, all back-pay claims had been satisfied. The fund had a remaining balance that exceeded $500,000 almost two years ago. Southwest requested that the balance be refunded to it. It argued that since the excess resulted from an error in estimating the cost of providing relief to the class, and since the policy of Title VII is compensatory rather than punitive, it was entitled to the return of the excess. Counsel for the class also claimed the balance of the fund. They argued that they were entitled to additional attorney's fees for claims administration work exceeding the original 600-hour estimate and for their defense against TWU's intervention. They also sought an increase in the "lodestar figure," allegedly necessary to make their hourly rate more competitive. In its order of June 26, 1986, the district court rejected the claims of both Southwest and class counsel. Instead, the court ordered that the balance of the fund should be "donated to a charity which, under the doctrine of cy pres, will have some salutory effect on preventing or remedying the effects of sexual discrimination."
 
 
 8
 Thereafter, eight charities submitted proposals for disposition of the balance. Counsel for both sides reviewed these proposals and advised the district court of their preferences. Unknown to counsel, CFT submitted the ninth proposal. Apparently, the district court solicited CFT's proposal, which begins: "Dear Judge ...: Thank you for asking us to review the various proposals relating to the ... case...."
 
 
 9
 On January 15, 1987, to the surprise of counsel for both sides, who had not been given notice or opportunity to comment on the CFT proposal, the district court awarded the fund balance to CFT. Both Southwest and counsel for the plaintiff class appeal the district court's disposition of the fund balance and its denial of their own claims to that balance.
 
 
 10
 After the district court denied class counsel's application for attorneys' fees from the fund to compensate them for the hours spent in opposing TWU's intervention and its motion to amend the decree, class counsel sought a fee award for these hours from TWU under Title VII. On April 17, 1987, the district court denied this fee request. Class counsel appeal this ruling as well.
 
 C.
 
 11
 On June 8, 1988, at oral argument, class counsel, Southwest and TWU announced that they had reached a settlement that would dispose of all issues presented by the consolidated appeals in this action. The proposed settlement returns to Southwest 64.5% of the fund balance and disburses the remaining 35.5% to class counsel. The settlement further provides that the class will relinquish its claim against TWU for fees, costs, and expenses. Finally, all parties agree to dismiss the pending appeals. At the suggestion of the parties, the panel invited CFT to comment upon the proposed settlement. CFT responded by filing a motion to intervene, to which the parties responded with a Joint Response in Opposition.
 
 
 12
 Thereafter this court directed the submission of briefs by CFT and the parties, addressing certain limited issues. Southwest and class counsel ask us to approve the settlement, or, if not, to determine the merits of the case. CFT asks us to disapprove the settlement and to uphold the district court's award of the remainder of the funds to it.
 
 II
 
 13
 At the heart of this case is the question whether the trial court abused its discretion in awarding the remainder of the back-pay fund to CFT under the cy-pres doctrine. In its order of June 16, 1986 invoking the doctrine, the district court relied upon In re Folding Carton Antitrust Litigation, 557 F.Supp. 1091 (N.D.Ill.1983), rev'd, 744 F.2d 1252, 1254 (7th Cir.1984). In that antitrust class litigation, class members and their counsel, as well as the defendant manufacturer of folding cartons, sought distribution of approximately $6 million remaining in a reserve fund. The fund had been established to pay late claims and to meet various expenses and contingencies associated with distribution of the approximately $200 million settlement fund. All claiming class members had been fully paid. Some class members had not stepped forward to present their claims, but the deadline for submission of claims had passed. After finding that none of the interested parties could lay legal claim to the fund, the court considered equitable claims. It determined that only the nonclaiming class members had persuasive equitable claims. Acknowledging the dilemma of how to dispose of funds when the only equitable owners could not be identified, the court turned to the doctrine of cy-pres. It defined cy-pres as "the proposition--one with equitable origins of its own--that where distribution to the class who should ideally receive a fund is impracticable or inappropriate, the distribution should be made in the 'next best' fashion in order as closely as possible to approximate the intended disposition." Id. at 1108. The court observed that there was some scholarly support for the notion that the unclaimed portion of a class action recovery may be applied cy-pres--"as nearly as possible"--to the failed or unachievable purpose for which the recovery is collected. The court concluded that since it had no way to distribute the remainder of the fund to the nonclaiming class members, the doctrine should be applied. Therefore, it used the reserve fund to establish an Antitrust Development and Research Foundation to promote the purposes of the Sherman Act.
 
 A.
 
 14
 We agree with the district court that, as in Folding Carton, none of the parties in this case has a legal right to the balance of the fund. TWU does not contend that it has a legal or equitable claim on the fund. Moreover, all class members who presented their claims received the full payment due them, and those who did not present claims have waived their legal right to do so. Thus, the class has no further legal rights in the fund.
 
 
 15
 Similarly, class counsel have no legal claim on the fund. Class counsel argue that in order to preserve and execute the consent decree, they had to expend more than the 600 hours provided for in the initial award of attorneys' fees. In addition, they were required to spend many hours meeting the threat to the consent decree posed by the union's intervention. Thus, they contend, under Title VII, or alternatively under the equitable "common fund doctrine" applied in Boeing v. Van Gemert, 444 U.S. 472, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980), they are entitled to recover additional attorneys' fees from the fund. The district court, however, considered class counsel's claims and rejected them on the ground that class counsel was given the opportunity to establish a reasonable fee at the "fairness hearing," and received on a "turnkey basis" exactly the fee it asked for; thus, the initial fee award was ipso facto reasonable and class counsel was precluded from making a "second trip to the well simply because there is more water than expected." Given this holding of the court, which is not clearly erroneous, we cannot say that the district court's denial of the application for additional attorneys' fees was an abuse of discretion. See Copper Liquor, Inc. v. Adolph Coors Co., 684 F.2d 1087, 1093-94 (5th Cir.1982). Thus we hold that the district court did not err in ultimately determining that class counsel have no legal claim on the fund.
 
 
 16
 With respect to class counsel's claim against TWU for fees arising from TWU's intervention, we need not consider the merits at this time because, even if TWU were found liable for the fees, the source of the fees would not be the fund.
 
 
 17
 Finally, Southwest has no legal claim on the balance of the fund. The consent decree provides in pertinent part: "The fund shall become nonrefundable to Defendant upon this decree becoming a final non-appealable judgment." Southwest clearly renounced its legal claim to any residual funds. Thus, as in Folding Carton, none of the parties to this litigation has a legal right to the balance.
 
 B.
 
 18
 We next consider whether any of the parties has a substantial equitable claim on the remainder of the fund. First, it is important to examine the purpose of the fund and whom it was to benefit. In Folding Carton it was extremely important in the analysis applying the cy-pres doctrine that the specific fund at issue was an ancillary fund specifically established "to cover expenses, costs and fees related to the administrative portions of the action, correction of claims arising after the first distribution, and to cover payment of late claims against the fund." 557 F.Supp. at 1099 (emphasis added). Given the specific nature and purpose of the fund, the court in Folding Carton concluded that of all the parties in the case, the nonclaiming class members had the only persuasive equitable claim. Since the court could not practically effect distribution of the remaining funds to the nonclaiming class members, it used the cy-pres doctrine to fashion a remedy it believed would achieve at least some of the as yet unrealized benefits for which the fund was intended. In In re Folding Carton Antitrust Litigation, 744 F.2d 1252 (7th Cir.1984), the Seventh Circuit reversed, holding that application of the cy-pres doctrine was unnecessary and inappropriate, in part because the original remedy had already substantially achieved the purposes of the Sherman Act. Id. at 1254.
 
 
 19
 We thus turn to consider whether the purpose of the back-pay fund in our case was substantially achieved. The basic purpose of this fund was to "make whole" victims of unlawful employment discrimination in accord with the compensatory purposes of Title VII. Franks v. Bowman Transportation Co., 424 U.S. 747, 763, 96 S.Ct.1251, 1264, 47 L.Ed.2d 444 (1976); Albemarle Paper Co. v. Moody, 422 U.S. 405, 418, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975). It cannot be doubted that this purpose was achieved. Every bona fide class member who came forward with a valid claim was paid his full measure of compensation under the consent decree. The district court itself noted in its order of June 26, 1986, "[I]t appears that all claimants have been determined and all claims paid. Thus, unlike the situation in Folding Carton, there are no claims outstanding." All who asserted valid rights have thus received their due in accordance with the purpose of Title VII and the fund.
 
 
 20
 It is true that although class counsel notified potential claimants by publication notice in 18 publications and personally notified over 500 potential claimants, only 228 claims were received and processed. We decline, however, to say that in order to achieve the purpose of Title VII every possible claimant had to assert a claim and have his claim determined. We think that reasonable notice and a fair opportunity to assert a claim is all that is required. There is no suggestion here that any class member did not receive such notice and opportunity. Each notice warned in bold type, "Failure to file your claim ... will terminate any rights you might have." These notices brought responsive claims from 39 states and Puerto Rico. Thus, because a reasonable and good-faith effort was made to notify all members of the class, and because the fund has satisfied the valid claims of every responding class member, we hold that the fund, pursuant to the consent decree, achieved the remedial purposes of Title VII.
 
 
 21
 (1.)
 
 
 22
 But even if we assume that the fund has not fully satisfied the purposes of Title VII, we would nevertheless be most reluctant to conclude that the equities, on the facts we have before us, would justify the alternative remedy ordered by the district court. We find the equities here are distinct from those that persuaded the district court in Folding Carton to apply the cy-pres doctrine.
 
 
 23
 The district court in Folding Carton concluded that the nonclaiming class members for whose benefit the reserve fund was established had a superior, indeed the only, equitable claim to the money. Because distribution directly to the equitable owners could not be effected, the court found it necessary to fashion an alternative remedy that would approximate at least some of the benefits intended for them. In ranking equitable claims here, however, the interests of the nonclaiming class members to the fund balance are not impressive, especially given that, unlike the fund in Folding Carton, the fund here was established to grant relief only to males who could show that they were victims of sex discrimination in a distinct period of time and for a specific job classification. As we have noted, this relatively small class received reasonable notice and ample opportunity to submit their claims, and thus, once those who responded were compensated, Southwest satisfied its obligation to the class. This situation stands in stark contrast to Folding Carton, where the reserve fund at issue was established specifically to benefit late claimants among a potential class of 35,000, the vast majority of whom it was impossible to identify with any accuracy. Here, even the district court, in explaining why it found the cy-pres doctrine applicable, was completely silent on whether nonclaiming class members had an equitable claim.
 
 
 24
 (2.)
 
 
 25
 On the other hand, the parties before us do have substantial equitable claims. Southwest's equitable claim is premised on the fact that all the money in the fund originally belonged to it. Southwest turned over the money for the specific and limited purpose of compensating the class. It did so in the expectation that compensating the class would exhaust the fund. The record of the fairness hearing reveals that Southwest and class counsel both wrongly assumed that claims alone would amount to $900,000 or more of the fund, exclusive of expenses. Since Southwest turned over its money in the clear and reasonable expectation that the money was required for the specific purpose of compensating the class, its equitable claim to any money remaining after the accomplishment of that purpose is compelling.
 
 
 26
 Nevertheless, we must consider this compelling interest in view of the nonrefundability provision of the consent decree. As reflected in the transcript of the fairness hearing, each side saw the clause as protecting it from the other's taking advantage of the situation. Southwest believed that by setting aside a sum certain and relinquishing legal title by means of the nonrefundability clause, it could cap its liability and avoid endless future haggling with claimants. For their part, class counsel feared that if Southwest did not renounce legal title to the money, Southwest would "nit-pick claims to death to save every dollar they could" against the date when the money could be returned to it. It is clear that the parties agreed to the nonrefundability provision only because, from their respective points of view, they believed it was necessary to protect the integrity of the claims process. Thus, for purposes of evaluating Southwest's equitable claim, we view the clause as provisional. Since all agree that the purpose of the clause was satisfied when all bona fide claims were paid in full, the clause cannot be viewed as a bar to Southwest's equitable claim.
 
 
 27
 The transcript of the fairness hearing contains other evidence of how the parties viewed the nonrefundability provision. Southwest's counsel made the following statement to the judge:
 
 
 28
 The only other matters, obviously Southwest Airlines has negotiated a settlement that it was prepared to live with and it signed it and filed it with the Court. Part of that settlement though does say that--that the back pay fund is nonrefundable and that the excess of that is then to be disposed of at the Court's discretion. And obviously we feel that if there is a surplus of money Southwest Airlines would like to have back any of the money that's there, plus the interest that may be accumulating on that money. And--so certainly we would.
 
 
 29
 We believe that this statement may be reasonably interpreted to assert Southwest's position that the nonrefundability provision served a limited purpose and that Southwest retained its equitable claim to any funds remaining after the class was made whole, notwithstanding its relinquishment of its legal claim.
 
 
 30
 At the fairness hearing, when Southwest's counsel pressed the judge about how he was inclined to dispose of any excess that might be left over, the judge replied:
 
 
 31
 The question of what the Court will do with any surplus money is not now answered. I don't like to answer questions that need not be answered. And I will wait to see if there is a surplus. I don't want to create any incentives one way or the other. I'll deal with it when I see what's there. I want these claims, the claims administration to go forward fairly and equitably and to be paid under the scheme what they're entitled to and nothing more and nothing less. If the--if there is money left over we'll deal with it at that time. But I don't see any point in trying to worry about that. See what's there.
 
 
 32
 We interpet the district judge's comments to mean that he, too, saw the nonrefundability clause as having the limited purpose of protecting the parties by eliminating incentives for either the class or Southwest to take advantage of the other. He obviously thought that any statement about how he would deal with a hypothetical surplusage would only create such incentives. In our view, the judge, in refusing to comment on the ultimate disposition of any surplus, did not foreclose the possibility of a return of funds to Southwest. To the contrary, he kept it open.
 
 
 33
 Thus, the record reflects that class counsel, Southwest and the district judge all understood the limited purpose and narrow scope of the nonrefundability clause in the consent decree, and realized that despite Southwest's relinquishment of its legal claim by virtue of the clause, once that purpose was achieved and all obligations to the class were fairly discharged, the clause would not bar a return of any excess to Southwest in recognition of its equitable claim.
 
 
 34
 In evaluating the defendant's equitable claim, we also consider the nature of its illegal conduct. Again, we find a situation here very different from Folding Carton, where the defendants had violated the Sherman Act, the overriding policy of which is punishment and deterrence. 557 F.Supp. at 1105. Here, Southwest was found in violation of Title VII, the policy of which, as we noted above, is compensatory rather than punitive. Furthermore, at the fairness hearing, the court stated and reiterated on the record that Southwest's hiring policy was not a product of invidious discrimination but "represented a market decision" that the airlines "believed in good faith to be legal, but found out to the contrary." Moreover, the court expressed its appreciation that during the litigation Southwest had "stated precisely what its policy was" and "defended it head on without equivocation." The court further observed that Southwest had moved quickly and in good faith to correct its hiring practices after the verdict was rendered. Taking into account the good-faith nature of the violation, Southwest's straightforward conduct of the litigation, its commendable efforts to bring its policies into compliance with the law, and the fact that the policy of Title VII is not punitive but compensatory, we conclude that Southwest comes to us with "clean hands" sufficient to claim equitable rights. In short, its conduct does not diminish its substantial equitable claim to the remainder of the fund.
 
 
 35
 (3.)
 
 
 36
 We now turn to class counsel's claim to the fund balance. As we already stated, the district court did not err in holding that class counsel have no legal right to fees from the fund. We cannot say, however, that class counsel have no equitable claim to the fund.
 
 
 37
 Our analysis begins by turning once again to the transcript of the fairness hearing. It reflects Southwest's assumption that after settlement of claims no money would be left in the fund for payment of legal fees. The transcript further reflects Southwest's fear that without some kind of negotiated cap on fees, it could be directly liable in an unpredictable amount for future legal work necessary to carry out the decree. Therefore Southwest sought to negotiate a one-time-only prospective fee for the postdecree legal work associated with claims administration. Southwest asked class counsel to estimate the hours required to administer the claims and to agree that Southwest's payment for those hours would constitute a complete discharge of its obligation to pay for decree administration. As the judge stated at the fairness hearing, the only way class counsel could come back for more would be if it "should, at some ... time be necessary for them to seek additional relief because of noncompliance or something."
 
 
 38
 In the light of this background, we turn to consider the claim for additional fees for hours spent in claims administration in excess of the 600-hour estimate. At the fairness hearing, both class counsel and the district judge observed that the 600-hour estimate "may prove to be on the low side before it's over." It is true that class counsel did not halt the hearing and attempt to reopen negotiations to raise the estimate. Nonetheless, it is clear that all assumed that class counsel's attorneys' fees would come directly from Southwest and that there would be little or no money left in the fund after payment of claims. Given that the additional work class counsel performed was necessary, that class counsel and the district judge acknowledged that the estimate might well be too low, and that, contrary to the parties' assumption, there is a source of funds available from which reasonable additional attorneys' fees could be paid without either harming the class or exceeding the liability cap negotiated with Southwest, we think class counsel have an equitable claim to attorneys' fees for hours reasonably expended in excess of the estimated 600 hours in the administration of the consent decree.
 
 
 39
 We next consider whether class counsel have an equitable claim for the hours that they expended in defending TWU's intervention and motion to modify the decree and judgment. The district court ruled--and for purposes of this opinion we can agree--that class counsel had no legal basis for a recovery of these fees from TWU, Southwest, or the fund. Since, however, class counsel were compelled to defend against TWU's intervention in order to preserve the decree, thus serving the interests of all the parties then existing; since class counsel's efforts created the fund in the first place; and since payment from the fund would not increase the total liability Southwest was willing to assume in the settlement and consent decree, we believe that class counsel can reasonably assert an equitable claim against the fund for those fees.
 
 
 40
 We must also consider, however, class counsel's conduct in evaluating its equitable claim. It is clear that an element in the district judge's denial of class counsel's claims for additional fees was his belief that once class counsel realized that a large surplus existed, they asked for unreasonably high enhancements and additional fees. Indeed, class counsel produced a figure that would exhaust the entire surplus. We share the district court's concern, and for this reason we hold that, although class counsel's conduct does not destroy its equitable claim, it does diminish it.
 
 
 41
 In sum, when we consider the equities, Southwest and class counsel have potent equitable claims on the residue of the fund, and the nonclaiming class members have no equitable rights. This case is therefore distinguishable from Folding Carton where neither the defendants nor class counsel had convincing equitable claims, and only the nonclaiming class members had equitable rights. The court there was compelled to apply the cy-pres doctrine only because it could not effect distribution of the fund balance to the sole deserving group, the nonclaiming class members. Because here the substantial purposes of the fund had been achieved, because the nonclaiming class members had no equitable rights, and because the district court ignored the equitable rights of Southwest and class counsel, we hold that the district court abused its discretion in awarding the fund balance to CFT.
 
 III
 A.
 
 42
 Having concluded that the district court erred in giving the balance of the fund to CFT, and that two parties to the litigation have persuasive equitable claims on the fund, ordinarily we would weigh the claims to determine which is superior and how the fund should be apportioned between them. In this case, however, we need not do so because the two parties have agreed how the fund should be apportioned. At oral argument, all parties to the appeal, including the class, Southwest, and TWU, submitted for our approval a settlement that would return to Southwest 64.5 percent of the back-pay fund balance and disburse to class counsel the remaining 35.5 percent to class counsel to cover unpaid costs and expenses associated with the case and to discharge class counsel's claims for additional attorneys' fees. TWU would benefit also from the settlement since by its terms the class would relinquish all claims against TWU for fees, costs, and expenses. Suffice it to say that in our view the settlement is fair, reasonable, and adequate, see In re Corrugated Container Antitrust Litigation, 643 F.2d 195, 212 (5th Cir.1981), because it provides for transfer of the balance of the fund to the only parties with equitable rights in it and in proportion to the relative equitable interests of those parties.
 
 B.
 
 43
 Furthermore, we think that it is appropriate TWU is relieved of any potential liability to class counsel for attorneys' fees generated by its intervention and motion to modify the consent decree and judgment. At the evidentiary hearing on TWU's motion for leave to intervene, TWU presented evidence that it had a statutory obligation to its members to intervene because it represented them under a collective bargaining agreement with Southwest. Memorandum Order of August 10, 1983, at 3 (citing Stallworth v. Monsanto Co., 558 F.2d 257, 268-69 (5th Cir.1977). Furthermore, the district court concluded that TWU's participation in the litigation was necessary because no other party had a stake in testing whether retroactive seniority could be awarded to post-decree male hires who had not been victims of sex discrimination. Id. at 4. In International Brotherhood of Teamsters v. United States, 431 U.S. 324, 97 S.Ct. 1843, 1865 n. 43, 1875, 52 L.Ed.2d 396 (1977), on remand United States EEOC v. T.I.M.E.--D.C. Freight, Inc., 659 F.2d 690 (5th Cir.1981), the district court found added support for the necessity of TWU's participation to protect the "expectations of innocent parties." Although the reason the district court articulated for denying class counsels' motion for attorneys' fees was that the class had not prevailed, it is clear that the district court believed strongly that TWU's intervention and effort to modify the decree flowed from legal duties owed by TWU to its membership. The court clearly believed that, even if the class had prevailed, the existence of such duties amounted to "special circumstances" which would render a levy of attorneys' fees on TWU "unjust." Newman v. Piggie Park Enterprises, Inc., 390 U.S. 400, 402, 88 S.Ct. 964, 966, 19 L.Ed.2d 1263 (1968). See also Independent Federation of Flight Attendants v. Zipes, --- U.S. ----, 109 S.Ct. 2732, 105 L.Ed.2d 639 (1989) (union that intervened to protect seniority rights in Title VII case, but was unsuccessful, was not liable for attorneys' fees where it did not violate Title VII and its intervention was not unreasonable or frivolous). Without reviewing the merits of the district judge's ruling, we need say only that the settlement is equitable insofar as it provides for payment of attorneys' fees out of the remainder of the back-pay fund and not from TWU.
 
 C.
 
 44
 CFT, who submitted briefs at the invitation of the panel but is not a party to this action, objects that we have no jurisdiction to approve the settlement because the district court did not consider it first and render a final decision on it. CFT further maintains that even if we have jurisdiction, we should not exercise it because the clear intent of Fed.R.Civ.P. 23(e) is that the trial court should approve class settlements. Since, however, CFT was never a party to this action, and since its motion to intervene in this appeal is denied,[1] CFT has no standing to raise this issue.
 
 
 45
 In any event, we have jurisdiction to approve this settlement. The parties timely appealed the orders adverse to them. The order of most critical importance to our inquiry, the order of January 15, 1986, giving the balance of the fund to CFT, included the words:
 
 
 46
 It is the intention of the court that this order shall conclude all issues and claims pending in this case and it shall be deemed a final order for purposes of appeal. This order is stayed, however, until all appeals have been exhausted or the time for taking such appeals has expired. (Emphasis added.)
 
 
 47
 An appealable final decision under 28 U.S.C. Sec. 1291 is one that ends the litigation on the merits and leaves nothing for the court to do but execute the judgment. Catlin v. United States, 324 U.S. 229, 65 S.Ct. 631, 89 L.Ed. 911 (1945). By its own terms, therefore, the January 15, 1986 order constituted an appealable final decision not just as to the award of the fund balance to CFT but also as to the district court's determination in its June 26, 1986 order that neither Southwest nor class counsel had any equitable claim to the fund balance.
 
 
 48
 Moreover, we have jurisdiction of the appeal from the April 17, 1987 order denying class counsel's application for attorney's fees from TWU. The April 17 order also was a final decision under Catlin, supra, because it decided the merits of class counsel's claim against TWU and left nothing for the district court to do with respect to that petition for attorneys' fees. In sum, by virtue of the district court having rendered final decisions in this case and the parties having timely appealed them, the district court relinquished its jurisdiction, Nicol v. Gulf Fleet Supply Vessels, Inc., 743 F.2d 298, 299 (5th Cir.1984), and we assumed it.
 
 
 49
 The question thus is not whether we have jurisdiction but whether it is appropriate for us to approve the settlement given the Rule 23(e) provision that "a class action shall not be dismissed or compromised without the approval of the court...." The purpose of Rule 23(e) is "to protect the nonparty members of the class from unjust or unfair settlements affecting their rights." Piambino v. Bailey, 610 F.2d 1306, 1327 (5th Cir.1980) (citing 7A C. Wright and A. Miller, Federal Practice and Procedure Sec. 1797 at 226 (1972). Ordinarily, some proceedings, or at least "familiarity with the litigants and their strategies, positions and proofs" are required to accomplish this objective. See Ace Heating and Plumbing Co. v. Crane Co., 453 F.2d 30, 34 (3d Cir.1971). As we noted above, however, in the instant case, a fairness hearing with respect to the settlement of the class claims was duly held, and the fund completely discharged its obligations to the class some six years ago. This action thus lost its class character long ago. Therefore, a remand is unnecessary to protect the interests of the class members. Compare U.S. Trust Co. of New York v. Executive Life Ins., 791 F.2d 10, 13 (2d Cir.1986). From the evidence in the record, we can easily determine whether the settlement is fair, adequate, and reasonable, see Corrugated Container, 643 F.2d at 212, and under the circumstances we believe that it is appropriate for us to do so.
 
 IV
 
 50
 In accordance with the foregoing, we REVERSE and VACATE the district court's order of January 15, 1987, and Part II of its order of June 26, 1986; and approve the settlement outlined herein.
 
 
 51
 REVERSED AND VACATED.
 
 
 
 *
 After submission of this case to the panel, a conflict developed for Judge Goldberg and he has withdrawn from further participation in the case; the case is therefore being decided by a quorum
 
 
 [1]
 Pending before us is CFT's motion to intervene dated July 18, 1988. CFT contends that it is entitled to intervene as of right under Fed.R.Civ.P. 24(a), or in the alternative, that it should be permitted to intervene under Fed.R.Civ.P. 24(b)(2) because its claims and those of the existing parties "have a question of law or fact in common." In NAACP v. New York, 413 U.S. 345, 93 S.Ct. 2591, 37 L.Ed.2d 648, the Supreme Court recited the following "accepted principles" relating to intervention:
 Whether intervention be claimed of right or as permissive, it is at once apparent, from the initial words of both Rule 24(a) and Rule 24(b), that the application must be "timely." If it is untimely, intervention must be denied. Thus, the court where the action is pending must first be satisfied as to timeliness.
 Id., 93 S.Ct. at 2602-03. In the instant case, the district court awarded the balance of the back-pay fund to CFT by its order of January 15, 1987, and class counsel and Southwest immediately appealed. CFT, however, did not seek to intervene to protect its position, although its interests stood to be prejudiced no less by the appeals on the merits than by the settlement proposed at oral argument. We note also by contrast that TWU, whose position was similar to CFT's in that it had benefited from the district court's resolution of issues in its favor, did not sit on the sidelines but appealed and fully participated in the further litigation of the case. Only when the parties proposed a settlement at oral argument a year and a half later did CFT move to intervene. Although we permitted CFT to brief the merits of the issues before us and have taken its arguments fully into consideration, we now deny the motion as untimely.