**United States Court of Appeals**
**FOR THE EIGHTH CIRCUIT**

_____

No. 96-3531

_____

Waymon Powell, Claudell Smith,      *
Willie Griffin, Hershel Ward, Odell  *
Lawson; International Woodworkers    *
of America, AFL-CIO, CLC; and        *
Local 5-475,                         *
                                     *
        Appellants,                  *    Appeal from the United States
                                     *    District Court for the Western
        v.                           *    District of Arkansas.
                                     *
Georgia-Pacific Corporation,         *
                                     *
        Appellee.                    *
                                     *
    _____             *
                                     *
International Woodworkers of          *
America, AFL-CIO, CLC, and Its       *
Local 5-475, Roy Matheny, Jr.,       *
and Others,                          *
                                     *
        Appellants,                  *
                                     *
        v.                           *
                                     *
Georgia-Pacific Corporation,         *
                                     *
        Appellee.                    *

_____

Submitted: April 17, 1997

Filed: July 11, 1997
_____

Before LOKEN, MAGILL, and MORRIS SHEPPARD ARNOLD, Circuit Judges.
_____

MORRIS SHEPPARD ARNOLD, Circuit Judge.

The plaintiffs appeal from an order disposing of a large sum of money in the district court's registry. The facts important to an understanding of the case are set forth in detail in Powell v. Georgia-Pacific Corp., 843 F. Supp. 491 (W.D. Ark. 1994). We affirm the district court.[1]

I.

The plaintiffs filed this class-action race discrimination case over twenty years ago. After several years of litigation, the district court found that the Georgia-Pacific Corporation (GP) had violated Title VII by systematically discriminating against the class members at its Crossett, Arkansas, facilities. Id. at 492. The parties later settled the remedy aspects of the lawsuit and entered into a consent decree that directed GP to deposit $2,666,667 into the court's registry " 'in full and final settlement of the money claims of the plaintiffs and members of the class.' " Id. The consent decree further indicated that the class members were entitled to interest earned on this settlement fund. Id. The parties set aside $350,000 as a "contingency fund for 'inadvertently excluded class members, underpayments, [and] computational errors.' " Id. The plaintiffs' counsel was named as the trustee for the contingency fund and was given the power to distribute funds from it, although court approval was required for

_____

[1]The Honorable H. Franklin Waters, Chief Judge, United States District Court for the Western District of Arkansas.

-2-

any distribution over $500. Id. Finally, the parties agreed that the court should determine how to dispose of any money remaining in the registry after distribution. Id. at 493.

In the consent decree, the parties agreed that distribution should proceed according to a "point system" designed to determine the amount of back pay due to each class member. Id. at 492. They further agreed that GP would use its payroll records to identify the eligible class, would calculate individual damages, and would distribute the settlement fund accordingly. Id. at 492-93. By March, 1984, the amount of money in the registry had grown to over $2.9 million. Id. at 493. At that time, the parties agreed to distribute $2,461,400 according to the point system, an amount that represented the total fund less the $350,000 contingency fund and "special circumstances" damages to named plaintiffs. Id. By the time that distribution actually occurred several months later, however, the settlement fund had accrued several hundred thousand dollars more in interest. This additional interest and the $350,000 contingency fund were never distributed. Interest has continued to accrue on these funds, and there is now nearly $1 million in the registry. Id.

Nearly eight years after the initial distribution, the plaintiffs filed a motion seeking distribution of the remaining funds. Id. The plaintiffs originally asked the court to use the money for scholarships benefiting class members and their families, but later changed their minds and sought to have the funds distributed directly to the class members. Id. at 493-94. (Their change of heart was apparently motivated by tax considerations. Id. at 493-94, 499.) Soon thereafter, GP filed a status report (apparently at the court's request) seeking to have the money distributed to the Georgia-Pacific Foundation, which would use it to establish a general scholarship fund for black high school students. Id. at 494.

The district court referred the case to a special master. Id. at 493; see also Fed. R. Civ. P. 53(a). Following an evidentiary hearing, the master recommended that

-3-

the court distribute the money to the class members pro rata. Powell, 843 F. Supp. at 497-98. The master concluded that the class members were entitled to the distribution both because they were not fully compensated by the original distribution and because most of the money remaining in the registry was attributable to interest and therefore belonged to class members according to the terms of the consent decree. Id. at 498.

The district court rejected the master's recommendation. Id. at 499. The court reasoned that each class member had been fully compensated according to the terms of the consent decree. Id. The court also noted that interest earned on the contingency fund accounted for most of the money in the registry, that the parties set this money aside to benefit unidentified class members, and that no new claimants had materialized in ten years. Id. at 493, 499. The court made it clear, however, that its primary concern was the fact that locating the individual class members for an additional distribution would be very difficult and costly. Id. at 498-99.

The court classified the money remaining in the registry as "unclaimed funds." Id. at 495. After considering several equitable doctrines governing the disbursement of unclaimed funds (including claimant fund-sharing, reversion to the defendant, and escheat to the government), the court opted for a cy pres distribution. Id. at 495-99. Because the court found that, at the time that they entered into the consent decree, the parties all wanted to use for scholarships any funds that remained after distribution (but were unable to agree on particulars), it ordered the parties to confer and to submit an agreed-upon scholarship program to be administered by the Georgia-Pacific Foundation. Id. at 499-500.

In June, 1994, the court issued an order approving a scholarship program outlined by the parties, and several months later the court issued an order disbursing the funds. Under the court's plan, the Georgia-Pacific Foundation will provide scholarships to 112 students over ten years, and any remaining money will go to the United Negro College Fund. Only black high school students who live in three

counties in Arkansas and three parishes in Louisiana are eligible for the scholarships. (These areas were selected because most of the class members lived in these counties while working at the Crossett facility.)

II.

The plaintiffs first assert that the district court erroneously characterized the money in the registry as "unclaimed funds." They contend instead that they are simply seeking an additional distribution according to the terms of the consent decree. The plaintiffs reason that, because the remaining money is attributable entirely either to interest or to the contingency fund, they are entitled to all of it. They support their argument with two provisions in the consent decree: First, the consent decree provides that interest is to be included in the settlement fund and distributed to the class; second, it names the plaintiffs' counsel as the trustee for the contingency fund and gives him the authority to distribute it. Id. at 492.

We do not think that these provisions of the consent decree mean that the money at issue in this case is not "unclaimed." See 2 H. Newberg and A. Conte, Newberg on Class Actions § 10.13 at 10-35 (3d ed. 1992) (defining "unclaimed funds" as the balance of a class recovery remaining after individual distribution). As we read the consent decree, the parties did not intend for the provisions upon which the plaintiffs rely to apply after the initial distribution of the settlement fund. In fact, a separate provision was included to govern the current situation. Paragraph 9(h) of the decree provides that as to "any monies still in the registry of the Court either as a surplus in the Settlement Fund or a surplus in the Contingency Fund, disposition shall be approved by the Court." Powell, 843 F. Supp. at 493. We therefore conclude that the court correctly found that the money in the registry was "unclaimed" and that neither party has a legal right to it.

III.

-5-

Because neither party has a legal right to the unclaimed funds, the court correctly turned to traditional principles of equity to resolve the case. There are four ways in which courts have distributed unclaimed funds of this sort: Pro rata distribution to the class members, reversion to the defendant, escheat to the government, and cy pres distribution. See generally 2 Newberg and Conte, Newberg on Class Actions § 10.15 at 10-38, 10-39. Because neither party challenges the court's decision not to allow a reversion of the funds to GP or to escheat them, we need determine only whether the court correctly settled on a cy pres distribution or, alternatively, whether the money should have been distributed pro rata.

We note at the outset that this is not an easy case. Because of the difficulties inherent in administering a settlement involving a class of over 2,000 members (particularly in light of the number of years that have passed since the original distribution), the district court's determination is entitled to a great deal of deference. Accordingly, we will reverse only if the court's resolution was a clear abuse of discretion. See, e.g., In re Folding Carton Antitrust Litigation, 744 F.2d 1252, 1255 (7th Cir. 1984), cert. dismissed, 471 U.S. 1113, 1120 (1985), and In re Equity Funding Corp. of America Securities Litigation, 603 F.2d 1353, 1362-63 (9th Cir. 1979).

Cy pres (sometimes called fluid-class) distribution has traditionally been used in cases in which class members are difficult to identify or where they change constantly, as when a utility is found liable for overcharging its customers. See, e.g., 2 Newberg and Conte, Newberg on Class Actions § 10.17 at 10-44, 10-45, and Market Street Railway v. Railroad Commission, 171 P.2d 875, 881 (Cal. 1946), cert. denied, 329 U.S. 793 (1946) (ordering streetcar company to use unclaimed funds to improve transportation facilities.). In these cases, the court, guided by the parties' original purpose, directs that the unclaimed funds be distributed "for the indirect prospective benefit of the class." See 2 Newberg and Conte, Newberg on Class Actions § 10.17 at 10-41. Cy pres distributions of unclaimed funds have been controversial in the courts of appeals. See, e.g., Six Mexican Workers v. Arizona Citrus Growers,

904 F.2d 1301, 1307-09 (9th Cir. 1990) (disapproving cy pres distribution to Inter-American Foundation "for distribution in Mexico," id. at 1307); Wilson v. Southwest Airlines, Inc., 880 F.2d 807, 809 (5th Cir. 1989) (rejecting cy pres distribution to general charitable organization); and Folding Carton, 744 F.2d at 1254 (holding that the district court abused its discretion in using cy pres distribution of unclaimed funds to establish an antitrust foundation).

In this case, however, we agree with the district court that a cy pres distribution is potentially appropriate. The court found that it would be extremely difficult to distribute the funds pro rata, and we cannot say that this factual finding is clearly erroneous. Over a decade has elapsed since the initial distribution, and many class members have probably relocated. (In fact, when the initial distribution occurred, over 125 checks were returned as undeliverable. Powell, 843 F. Supp. at 498.) A pro rata distribution would be further complicated by the fact that GP (the party entirely responsible for conducting the first distribution) is no longer responsible for locating class members and distributing the funds. Id. at 498-99.

After carefully reviewing the record, we also conclude that the cy pres remedy fashioned by the court was not an abuse of discretion. We emphasize that, partly because the plaintiffs waited many years to seek distribution of the funds, the district court was faced with a choice among "second bests." In this difficult situation, the court carefully weighed all of the considerations and tailored its remedy to reflect the parties' original intention regarding unclaimed funds. Although the plaintiffs may object to some of its particulars, the scholarship program balances the equitable interests involved in the case with the need to conserve judicial resources. It is clear that at the time of the consent decree, both sides of this dispute wanted to use for scholarships any money remaining after distribution, and the district court took care to preserve that initial intention. Furthermore, because the scholarships will be made available only to black students in the vicinity of Crossett, Arkansas, the program will likely also

promote the plaintiffs' desire to have the scholarships benefit the class members' younger relatives.

## IV.

The plaintiffs also challenge the district court's denial of their motion for attorneys' fees. In denying the motion, the court relied on a provision in the consent decree that provides class counsel with fees for ninety days following the initial distribution. The plaintiffs assert, however, that this provision does not apply here and that they are equitably entitled to additional fees because they have expended a great deal of time and money to ensure that this final distribution reflects the purpose of the consent decree. We agree.

In our view, the work performed in this proceeding is analogous to "postjudgment monitoring of a consent decree," which is "a compensable activity for which counsel is entitled to a reasonable fee." Pennsylvania v. Delaware Valley Citizens' Council, 478 U.S. 546, 559 (1986). Although the amount of fees requested may be subject to reduction for factors such as those discussed in St. Louis Fire Fighters Association v. City of St. Louis, 96 F.3d 323, 332 (8th Cir. 1996), and Association for Retarded Citizens v. Schafer, 83 F.3d 1008, 1011-12 (8th Cir. 1996), cert. denied, 117 S. Ct. 482 (1996), the complete denial of a fee award is not appropriate.

## V.

For the foregoing reasons we affirm the judgment of the district court, but remand the case with direction to award appropriate fees to the plaintiffs' counsel.

-8-

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.